## IN THE MATTER OF ARTHUR K. TRASK, ATTORNEY AT LAW.

### No. 4104.

MARCH 29, 1963.

TSUKIYAMA, C. J., CASSIDY, WIRTZ, JJ., CIRCUIT JUDGE
JAMIESON IN PLACE OF LEWIS, J., DISQUALIFIED,
AND CIRCUIT JUDGE HEWITT IN PLACE OF
MIZUHA, J., DISQUALIFIED.

*Per Curiam.* This matter is before us on exceptions taken by Arthur K. Trask, respondent attorney, to the report submitted to the court on November 6, 1958, by the commissioners on improper or unprofessional conduct (commonly designated the legal ethics committee) appointed and acting under rule 16 of this court. It was the unanimous finding of the three commissioners submitting the report that the respondent was guilty of unethical conduct and it was their recommendation that he be censured and that his license to practice be revoked or suspended for such period as the court might deem appropriate. This court designated the attorney general to act as attorney in support of the recommendations of the commissioners.

The proceedings were initiated by the complaint of Elizabeth Cox Abrams set out in a letter addressed to this court under date of September 6, 1956. The clear import of the letter charged the respondent with repudiating an agreement he had made with the complainant on the amount of the fee he would charge in representing her in the action hereinafter referred to. The complaint was first referred by the commissioners to the committee on inquiry for the first circuit, which, after a preliminary investigation, recommended that the commissioners take cognizance of and act on the charge. Hearing before the com-

missioners commenced on May 27, 1957. The respondent appeared and personally conducted his defense before the commissioners.

The exceptions to the commissioners' report cover a wide range. The number of points raised and the technical nature of many of the contentions made by respondent tend to obscure the issue on the merits of the case. In order to bring these proceedings into proper focus at the outset, we will first turn to and consider that issue as it is presented by the respondent's exceptions 4 and 5, challenging the sufficiency of the charge and the evidence to sustain it.

Mrs. Abrams was injured in an automobile accident on August 5, 1953. On September 2, 1954, the respondent filed a suit in the Federal District Court of Hawaii for recovery of damages sustained by Mrs. Abrams and her husband as a result of the accident. He later filed a suit on behalf of complainant's children for damages alleged to have resulted to them for loss of nurture, comfort, solace, et cetera, as a result of the injuries she sustained. The suits were consolidated for trial. Attorney John Alexander was associated with respondent in the trial of the case, which commenced on November 7, 1955, and ended exactly a month later when the jury returned a verdict in favor of Mrs. Abrams in the amount of $40,000.00, and in favor of her children in the amount of $10,000.00.[1]

It is definitely established and conceded that after respondent was retained and some time before commencement of the trial he advised Mrs. Abrams and orally agreed he would represent her on a contingency arrangement by which he would receive 25% of the amount of any recovery in any settlement made before trial, 30% of the

[1] The judgment entered on the verdict for the children was eventually set aside and their action was ordered dismissed by the Ninth Circuit Court of Appeals. *Meredith* v. *Scruggs*, 9 Cir., 244 F.2d 604.

recovery upon trial, and 40% of the recovery if an appeal followed.

Respondent received a check in the amount of $40,148.66 in satisfaction of the judgment and accrued interest. It was made out jointly to respondent, Mr. Alexander and Mrs. Abrams. On February 3, 1956, respondent presented the check to Mrs. Abrams through his secretary for her endorsement. At the same time she was tendered respondent's personal check in the amount of $26,148.66 as the purported net amount due her after the deduction of his fee. In a covering letter, respondent stated: "The division: $14,000 (35% of $40,000) represents gross attorneys' fees."

Mrs. Abrams testified that when she saw respondent's check she immediately realized it was made out for less than the amount she knew she was entitled to receive, and, the secretary being unable to give her an explanation for the discrepancy, she telephoned the respondent and protested that, under the agreed 25%–30%–40% fee arrangement, his check to her was $2,000.00 short. She said the respondent told her she was in error on the percentages and that he insisted their agreement for his fee was on a 25%, 35%, and 39% basis. She said that she reminded him she needed the money to pay her debts but that he told her, "Well, unless you sign I can't give you the money, and that's it." The complainant testified she insisted in her protest that she was entitled to $2,000.00 more but as her efforts to convince respondent were ineffectual, she acquiesced, endorsed the check for the judgment and accepted the check tendered by respondent because of her necessitous circumstances.

The respondent's version of the conversation over the telephone was that Mrs. Abrams told him that the agreement called for 30%, that he said it was 35%, that she then said she didn't remember, and that he thereupon told

her, "So you can do what you want to do but I feel that's it."

The chairman of the ethics committee asked the respondent if he told Mrs. Abrams "that if she signed the check she would be admitting that she owed you the 35[%] and that she couldn't make any claim for it?" Respondent's reply was that he did not, "because she was extremely —apparently capable of knowing what she was doing. She said it was 30 and I said it was 35. I didn't know whether or not she was going to sign it or not. That is my solemn remembrance."

In response to another commissioner's question as to whether he felt that by signing the check Mrs. Abrams was acquiescing in his contention that it was 35%, respondent replied: "I devotedly do and particularly with this: subsequent to that, I was rehired, she was calling me when she was in the hospital. Mr. Wrenn, I do."

Mr. Alexander entered the case a week or two before the trial started. There is conflict on whether the suggestion to obtain an associate counsel emanated from the respondent or Mrs. Abrams, but it is the respondent's position and testimony he telephoned Mrs. Abrams after he had engaged Mr. Alexander to help him and told her that by reason of the additional cost to him from Mr. Alexander's coming into the case the fee allowance for the trial would have to be changed to 35%, and that she said that was agreeable to her. Mrs. Abrams denied that such agreement or any other to modify the original schedule of fee allowance was ever proposed or made. This was and is the crucial issue in the case.

The commissioners resolved the issue against the respondent. We are convinced from an independent consideration of the testimony and the evidence in the record that the conclusion reached by the commissioners was the correct one.

In appraising the credibility of the two principal witnesses on the written record we are without the benefit the commissioners had of observing their respective manners and demeanors in testifying. However, on a comparison of their testimonies as transcribed we think the conclusion is inescapable that the testimony of Mrs. Abrams carries much greater conviction than that of the respondent.

The commissioners state in their report they were much impressed by the straightforwardness of Mrs. Abrams. The attorney general urges that the respondent was evasive and unresponsive in answering many pertinent questions put to him. The record compels us to agree with them. In addition, Mrs. Abrams' testimony is corroborated and supported by independent, credible testimony on many incidental factual issues that developed during the course of the hearing. One instance, by way of example, is the clash between her testimony that she requested respondent on many occasions to let her know what he was going to charge and to put it in writing, and the respondent's testimony that no such request was ever made. Her testimony is fully corroborated by the respondent's secretary who testified that even though he did not know what the respondent intended to charge, he had endeavored over a period of months, without success, to induce him to enter into a written fee agreement with his client. The testimony of this witness also tends to refute the respondent's testimony to the effect that Mrs. Abrams told him over the telephone on February 3, 1956, that she had forgotten the fee arrangement called for 35%, and to sustain her testimony that she insisted and maintained that she knew it was 30%. Finally, the clear-cut evidence respecting the shocking manner in which the respondent attempted to take advantage of and shortchange his associate counsel tends to indicate respondent's bent of mind

on February 3, 1956, and to strongly support the complainant's charge against him.

Mr. Alexander testified that when respondent engaged him as associate counsel the respondent agreed that he would "pay me 25% of his fee—whatever he earned on it." Respondent does not contend that any other agreement was made with Mr. Alexander. Respondent's testimony in that respect was: "I told him that for the peace of mind of the Abramses that it would be good perhaps that he entered the case, they would feel probably a little more comfortable about it, and if he would be free to do so and he said yes. So I told him that it will be one-fourth of the fee that I was getting." Mr. Alexander said he was not informed and did not ask what the fee arrangement between respondent and Mrs. Abrams was. The respondent testified to the same effect. However, some weeks after the trial but before the controversy arose between respondent and Mrs. Abrams, Mr. Alexander requested that information from Mrs. Abrams and was told that her agreement with the respondent was on a 25%–30%–40% basis. He testified that the reason he made this inquiry of Mrs. Abrams, rather than of the respondent, was that toward the very end of the trial the respondent "began behaving cooly to me."

On February 3, 1956, the same day that respondent tendered the payment to Mrs. Abrams, he sent Mr. Alexander a check in the amount of $2,000.00 in payment for services as associate counsel. Knowing from the information given him by Mrs. Abrams that he was entitled to $3,000.00 as his one-fourth share of the fee payable by her, Mr. Alexander rejected the tendered check and demanded proper payment. Within a matter of a few hours respondent sent him a check in the amount of $3,000.00. Respondent's explanation for sending the first check was that he. was dissatisfied with his associate's work and that on his

evaluation of it Mr. Alexander was entitled to no more than $2,000.00. The excuse and respondent's unnecessary and, we think, unjustified abuse of his fellow lawyer before the commissioners to support it, merely aggravate the grievance.

Respondent testified that he normally fixed his rates when retained on a contingent basis considerably in excess of 25%–30% and 40%, and that he agreed to the lesser rates with Mrs. Abrams because of his close friendship since boyhood with her husband. The commission recognized that respondent rendered valuable service to his client. The record bears out that he did perform his task with commendable ability and effort in a difficult case and against a formidable opponent. There can be no question that in a comparable case a contingent trial fee of 35% would be entirely reasonable. It is not difficult therefore to see how respondent could have reached the conclusion in retrospect, that with the association of Mr. Alexander on the terms he had engaged him, he had made an improvident arrangement for his share of the fee. However, this obviously was no justification for any attempt on his part to unilaterally modify his agreement with either Mr. Alexander or Mrs. Abrams. *In re Burns,* 55 Idaho 190, 40 P.2d 105; *In re Choate,* 174 Okla. 446, 50 P.2d 706.

It has been held in this jurisdiction that in disciplinary proceedings the charge against an attorney accused of unprofessional conduct must be sustained by clear and convincing proof. *In re Davis,* 15 Haw. 220; *In re French,* 28 Haw. 47; *In re Bouslog-Sawyer,* 41 Haw. 403. These cases were decided when the rule governing disciplinary proceedings contained no provision respecting the quantum of proof. The rule (rule 16) governing this proceeding was adopted in 1955. Paragraph (c) (9) thereof provides that, in contested cases, "the charge must be established by a preponderance of the evidence." By paragraph

(c) (12) of the rule it is further provided that, "The court will adopt a finding of fact made by the commissioners unless upon a consideration of the entire record it is of the opinion that such finding is not supported by a preponderance of the evidence." The degree of proof required by the rule is consistent with the nature of disciplinary proceedings. *In re Mayberry,* 295 Mass. 155, 3 N.E.2d 248. Proof by a "fair" or a "clear" preponderance of the evidence is all that is required in many, if not in most, jurisdictions. See Annot. 105 A.L.R. 984 and note in 37 Notre Dame Lawyer 346.

We are convinced, after full and careful scrutiny of the entire record, that the charge against the respondent is clearly and satisfactorily supported by a preponderance of the evidence.

It is in effect contended on behalf of respondent, however, that even if Mrs. Abrams' charge and her testimony are accepted at face value, all that is proven is that a bona fide dispute existed between attorney and client over the amount of a fee calling only for civil redress and that, however viewed, no specific violation of the Canons of Professional Ethics has been shown.[2]

To hold an attorney answerable for unprofessional conduct, it is not necessary that his offense be specifically spelled out in some particular provision in the code of ethics. The canons of ethics were not intended to have that restrictive effect, as clearly appears from the preamble, reading: "No code or set of rules can be framed, which will particularize all the duties of the lawyer in the varying phases of litigation or in all the relations of professional life. The following canons of ethics are adopted by the American Bar Association as a general guide, yet the

---

[2] Rule 16(a) of this court provides: "*Canons.* The Canons of Professional Ethics and the Canons of Judicial Ethics, adopted by the American Bar Association, shall govern the conduct of the judges and the members of the Bar of the Territory of Hawaii."

enumeration of particular duties should not be construed as a denial of the existence of others equally imperative, though not specifically mentioned."

Canon 11 of the Canons of Professional Ethics, in part, provides: "The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client." This canon expressly reflects the generally accepted and universally recognized tenet that the special relationship existing between attorney and client requires the utmost honesty, good faith and fairness on the part of the attorney in all of his dealings with his client. As stated in 7 C.J.S., *Attorney and Client*, § 125, p. 957: "Not only must an attorney exercise reasonable care and diligence and possess the legal skill and knowledge ordinarily possessed by members of the profession, but he is bound to conduct himself as a fiduciary occupying a position of the highest trust and confidence, so that, in all his relations and dealings with his client, it is his duty to exercise the utmost honesty, good faith, fairness, integrity, and fidelity, and if he does not he is strictly liable or accountable to his client." Also pertinent in this connection is the statement in *In re Stuart*, 257 Ala. 184, 57 So.2d 874, where in reviewing the Alabama grievance committee's action in suspending an attorney the court said, at p. 875: "In considering the question, we are not dealing with legal niceties, but the measure of good faith to be accorded by an attorney to his client and whether he has properly demeaned himself toward those high standards and trusts which inhere in his calling. Decision is not to be gauged by technical accuracies. The standard of ethics required of him is of a much higher character than is required in customary business dealings, where the parties deal at arm's length."

We think canon 11 is directly applicable and that it

was breached by respondent. Certainly his action in repudiating the fee agreement and placing his client in a position where he later could claim or attempt to claim that her acceptance of his check constituted an accord and satisfaction was a gross violation of "his duty to exercise the utmost honesty, good faith, fairness, integrity, and fidelity" to his client.

Further, even if it were possible to accept respondent's contention that what is involved here is but a bona fide dispute between attorney and client over the amount of the fee, we think respondent's conduct would still be unprofessional and censurable.

The amount in dispute between respondent and his client was only $2,000.00. That was, under any view of the evidence, all that he could with propriety have withheld from her. Acting in good faith he should therefore have given her the $26,000.00 without conditions, expressed or implied, and with the understanding that settlement of their dispute over the amount would be left open for future determination. "* * * A claim by an attorney to a part of the sum in hand does not excuse his failure to pay over promptly to his client the part as to which there is no claim." *In re Kraus,* 322 Pa. 362, 185 Atl. 737, 739. "The mere disagreement on such matters [costs and attorney's fees] will not justify the retention by an attorney of the whole sum collected. In such a case he may remit to his client all over and above the disputed part, and thus avoid any suggestion of bad faith. * * *" *Denny* v. *Commonwealth,* 175 Ky. 357, 194 S.W. 330, 333.

In extending the argument that the record reveals only a dispute over a fee, respondent now urges that he was entitled, irrespective of any modifying agreement with Mrs. Abrams, to a fee in excess of 30% because, as a matter of law, he was not required to bear the burden of the compensation to be paid associate counsel. *Lipscomb's*

*Adm'r* v. *Castleman,* 147 Ky. 741, 145 S.W. 753, and *Townsend* v. *Rhea,* 18 Ky. L. Rep. 901, 38 S.W. 865, are cited in support of the proposal. While these cases, and the principle for which they are cited, might have application if the question of the complainant's right to the $2,000.00 in dispute were in issue in a civil suit, they can have no bearing in this proceeding. Civil liability is not determinable and has no effect in disciplinary proceedings. *Bennett* v. *The State Bar,* 27 Cal.2d 31, 162 P.2d 5; *In re Tanz,* 233 App. Div. 300, 252 N.Y. Supp. 769; *People ex rel. Healy* v. *Allen,* 244 Ill. 393, 91 N.E. 463; *In re Egan,* 36 S.D. 228, 154 N.W. 521; *In re Maloney,* 35 N.D. 1, 153 N.W. 385. A further and full answer to respondent's contention is that he did not represent to his client or claim at the time the dispute between them arose that he was demanding the additional allowance to take care of Mr. Alexander's fee. The gravamen of his defection is his repudiation of the original fee agreement with his attending effort and success in having her accept his tender to her possible disadvantage.

Finding, as we do, that Mrs. Abrams' charge has been sustained, disciplinary action is in order unless any of the other contentions made by respondent requires a dismissal of the charge or a remand of the matter for a new hearing before the commissioners.

Another ground upon which respondent urges that the charge against him should be dismissed is based on the contention that rule 16 is invalid and that therefore the proceedings against him thereunder were null and void.

Rule 16 provides for reference to and a hearing by the commissioners appointed thereunder on charges of unprofessional conduct by attorneys of the bar. It contemplates and provides for a full hearing before the commissioners who, at the conclusion thereof, are required

to submit a report to the court. If the commissioners find the attorney guilty of unprofessional conduct, he has a right to contest the finding by filing exceptions to the report in this court. The review by this court is on the record alone. There is no trial de novo, as was expressly provided for in our rule governing disciplinary proceedings before the adoption, in 1955, of the present rule 16. (See old rule 19 set out, in 39 Haw. at p. 707.)[3] It is by reason of this lack of de novo hearing in this court that respondent urges that rule 16 is invalid. It is contended that the rule provides for an invalid delegation of the court's judicial duty and power, contrary to the provisions of R.L.H. 1955, § 217-1, reading: "* * * The supreme court shall have the sole power to revoke or suspend the license of any such practitioners or to dismiss or suspend them from the roll of practitioners for malpractice, fraud, deceit or other gross misconduct."

The power to regulate the admission to practice and disbarment or disciplining of attorneys is judicial in nature and is inherent in the courts. *In re Bouslog-Sawyer, supra,* 41 Haw. 403; *Ex parte Thompson,* 228 Ala. 113, 152 So. 229; *Hertz* v. *United States,* 8 Cir., 18 F.2d 52; *In re Patterson,* 9 Cir., 176 F.2d 966; 7 C.J.S., *Attorney and Client,* § 18, p. 728. Subject to the limitation that the essential elements of notice and opportunity to be heard must be preserved, the court may prescribe such procedure in disciplinary proceedings that it deems appropriate. The primary power in that respect rests with the court and not the legislature. *In re Keenan,* 313 Mass. 186, 47 N.E.2d 12; *In re Gorsuch,* 113 Kan. 380, 214 Pac. 794. If § 217-1 could be construed, as respondent

---

[3] Rule 16 is patterned after the draft of Model Rules of Court for Disciplinary Proceedings prepared by a committee of the American Bar Association. See 81 A.B.A. Rep. 482 (1956).

contends, to limit our supervisory authority over practicing attorneys and to limit our power to prescribe the procedure to govern disciplinary proceedings, we would be confronted with the delicate task of determining the validity of the statute. However, we perceive no conflict between § 217-1 and rule 16.

The limitation in § 217-1 relied on by respondent is the provision placing *"the sole power* to revoke or suspend" an attorney's license in this court. The commissioners are not vested with that power under rule 16. They are authorized only to make a recommendation to the court in that respect. Since the power to suspend or revoke an attorney's license rests exclusively with and is exercisable only by this court there is not, as respondent contends, a delegation of judicial power to the commissioners under the rule. *In re Platz,* 60 Nev. 296, 108 P.2d 858; *Phipps* v. *Wilson,* 7 Cir., 186 F.2d 748; *In re Donaghy,* 393 Ill. 621, 66 N.E.2d 856.

The procedure prescribed by rule 16 is very practical. Proceedings under the new rule are much more convenient to the court and to all parties concerned in a disciplinary hearing than the formerly existing practice of trying disciplinary proceedings anew in this court. The accused attorney's rights are adequately protected. He has full opportunity to be heard and to make his record before the commissioners. Under the new rule he is given ample opportunity in this court to challenge the charge and the findings of the commissioners on that record. We are of the opinion that the limited delegation to the commissioners under rule 16 of authority to investigate, report and make an advisory recommendation does not offend anything contained in § 217-1, and that the procedure prescribed by the rule is valid. See *In re Roth,* 398 Ill. 131, 75 N.E.2d 278; *Montgomery Co. B. Ass'n* v. *Rinalducci,* 329 Pa. 296, 197 Atl. 924; *People ex rel. Karlin* v.

*Culkin,* 248 N.Y. 465, 162 N.E. 487; *In re Petersen,* 208 Cal. 42, 280 Pac. 124; *In re Goldstone,* 214 Cal. 490, 6 P.2d 513; *McVicar* v. *State Board of Law Examiners,* W.D. Wash., 6 F.2d 33.

The exception particularly stressed by respondent is his exception No. 1 reading as follows:

"That in the proceedings upon which the report is founded the respondent was denied due process of law in that he was not (a) furnished with a copy of the complaint prior to the commencement of the proceedings, (b) given an opportunity to object to the charges as provided in rule 16,(c),(5)[4] of this Court, (c) advised as to the nature of the tribunal before which he appeared or the source of its authority and consequently and to his prejudice did not know until almost the close of the proceedings that it was a fact finding body."

The commissioners' report, filed in this court on November 6, 1958, was placed on secret file. While it was on secret file respondent moved to dismiss the charge against him on the grounds which closely parallel those of the exception now being considered. The then existing territorial supreme court, after a hearing on the motion, denied it in an unpublished opinion filed on January 27, 1959. The ruling of the court was as follows:

"Respondent seeks dismissal of the proceedings on the ground that no complaint has been filed in accordance with the provisions of rules 16(c)(3) and (4). He states other grounds for dismissal, but we need not consider them here because they are matters that may be covered in the exceptions to the report.

"Rule 16(c)(3) provides: 'Any private person acting through an attorney at law, or the Attorney General, or the Bar Association of Hawaii (herein-

---

[4] The specifications of error and the argument show that the rule intended to be referred to is rule 16(c)(4).

after called the "Bar Association") may, with the consent of the commissioners, file a complaint and prosecute the same.' The portion of rule 16(c)(4), pertinent to the instant motion, provides: 'A complaint must be signed by the person or persons aggrieved or by the President or Secretary of the Bar Association, or by the Chairman of the Committee on Inquiry. The charges must be sufficiently clear and specific reasonably to inform the respondent of the misconduct charged.'

"Respondent's position appears to be that complainant's letter is not a proper complaint under rule 16(c)(3) because it has not been filed and prosecuted by the complainant acting through an attorney at law, or the attorney general, or the Bar Association of Hawaii, with the consent of the commissioners.

"Under respondent's construction of rule 16(c)(3), a private person may not file and prosecute a complaint personally. The rule does not have such restrictive effect. It is a provision which permits representation of a private complainant in a disciplinary proceeding by an attorney at law, the attorney general or the Bar Association, not a provision which requires such representation.

"Under rule 16(c)(1) complaint must be written. Under rule 16(c)(2) complaint may be formal or informal; the rule also permits the commissioners to institute an investigation upon oral information. The provisions in rule 16(c)(4) regarding the signing of a complaint by the chairman of the committee on inquiry covers the situation where such complaint is the result of investigation made on oral information.

"A complaint meets the requirements of rule 16 if it is written and is sufficiently clear and specific reasonably to inform respondent of the misconduct

charged. Respondent did not object to the complaint at the hearing before the commissioners on the ground that it was not sufficiently clear and specific. He submitted to the hearing and, at its conclusion, presented to the commissioners a memorandum reviewing the evidence and setting forth his argument as to the law applicable to the proceeding. He may not now say that he was not reasonably informed of the misconduct charged or that he did not have a fair hearing.

"The motion, as to dismissal of the proceeding and, in the alternative, for remand to the commissioners, is denied. The matter will be placed in open file and respondent shall have twenty days from date to file his exceptions to the commissioners' report."

While the respondent's exception No. 1 and the argument presented on it to some extent amplify the grounds urged for dismissal, we do not consider any difference between the issues presented by the motion and those by the exception to be of a fundamental nature. The disposition of the motion to dismiss therefore obviates the necessity of any further consideration of exception No. 1.

Another contention made by respondent is that the commissioners' report should be set aside and the matter sent back to the commissioners for a new hearing for the alleged reason that Commissioner Heaton L. Wrenn was disqualified from sitting on the hearing of the charge.

It appears from the record that some time before respondent was retained by Mrs. Abrams she had consulted Mr. Martin Anderson, a junior associate in the commissioner's law firm, with the view only of attempting to recover the loss of earnings and other out-of-pocket expenses. Mr. Anderson arranged with the insurance carrier responsible to handle the matter directly with Mrs. Abrams as a routine claim. As that was all Mrs. Abrams wanted at the time, Mr. Anderson then bowed out of the

picture. The matter was closed as far as the commissioner's firm was concerned by its bill to complainant for services rendered in the amount of $20.00.

In respondent's opening brief it is contended that Mr. Wrenn was disqualified from sitting by virtue of canon 26 of the Canons of Judicial Ethics, and particularly under the provision thereof reading: "It is desirable that he [a judge] should, so far as reasonably possible, refrain from all relations which would normally tend to arouse the suspicion that such relations warp or bias his judgment, or prevent his impartial attitude of mind in the administration of his judicial duties." In his reply brief, reliance is placed upon the provisions of § 84 of the Organic Act (effective at the time of the hearing), declaring that no person shall sit as a judge in any case in which he has been "of counsel." We think it clear that each of these provisions is applicable only to one sitting in a true judicial capacity, and that neither has any application here.

There is no question but that an attorney being tried by a committee such as is set up under rule 16 is entitled to one whose members are free from any personal bias or prejudice against the accused attorney. A fair trial by an impartial tribunal is essential to due process. *In re Schlesinger*, 404 Pa. 584, 172 A.2d 835. If Mr. Wrenn were disqualified, it would necessarily have been by reason of something that occurred in the transient relationship between his firm and Mrs. Abrams which, as a matter of fact, rendered him biased and prejudiced against the respondent. There is nothing in the record which has the slightest tendency to warrant that conclusion. The character of Mr. Anderson's service in behalf of Mrs. Abrams had no relation whatsoever to the subsequent matters which gave rise to the cause here in issue. Further, it was conceded by respondent's counsel on oral argument that

the matter of Mr. Wrenn's ·disqualification presents no jurisdictional question. Consequently the objection to the commissioner sitting on the hearing was one which could be waived. The record shows that it was definitely and knowingly waived by respondent at the hearing.

Mr. Wrenn had forgotten the·part his firm had acted in the original negotiation for the settlement of the complainant's claim, until his attention was directed to the matter by consideration of a memorandum in evidence, prepared by Mr. Anderson covering his brief dealings with Mrs. Abrams. The commissioner immediately apprised respondent of his discovery and indicated he would withdraw from the hearing if that was deemed necessary and proper. We need not extend the colloquy in the record since we conclude that Mr. Trask's waiver of any purported disqualification of Mr. Wrenn, and his willingness to proceed with the commissioner sitting, is sufficiently shown by excerpts from the transcript of statements made by him, as follows:

"Yes. Well, the question is this—I don't—I hesitate and don't wish to raise the question of disqualification—this is kind of new to me, and as I say, it was altogether—.

* * *

"Well, as I say, if she hadn't brought it up,[5] I would not have raised it at all.

* * *

"I don't know whether this disqualification comes in or not, but Mr. Wrenn was interested in the thing and he talked about it and this is just so there would be no—the way I looked at it, why, it was said for some purpose and it has been allowed to stay in. I

---

[5] This has reference to the fact Mrs. Abrams had testified that while she told Mr. Anderson she did not want to and had no intention of suing, she asked him what his contingent fee would be "should we sue and go to court," and was told it would be 30% of recovery.

mean if you feel that there is no disqualification, let's proceed. I mean I don't want to hold this thing up at all—my purpose is not to hold it up, but since you were anxious about it, I wanted that cleared up."

We pass over the question of whether or not the respondent should have raised the question of Mr. Wrenn's disqualification prior to commencement of the hearing. See *In re Davis,* 15 Haw. 377. From the foregoing, it is certain that during the hearing he was given the opportunity to press for disqualification of Mr. Wrenn and that he not only failed to do so but expressly indicated his willingness to proceed notwithstanding the fact Mr. Wrenn's firm had been previously consulted on Mrs. Abrams' claim. Under the circumstances, it is too late now to contend that the commissioner was disqualified or that respondent was prejudiced by Mr. Wrenn's sitting on the hearing. See *In re Bouslog,* 41 Haw. 270, 274 .

There are many subsidiary points raised and argued by respondent. We have considered them all, and find none to have sufficient merit to warrant separate treatment. None is of a fundamental nature. Notwithstanding any procedural deviations, respondent was fully aware from the very inception of the hearing of exactly what he was called upon to refute. He was allowed almost unrestricted leeway by the commissioners in examining witnesses and in presenting his case. He took full advantage of the opportunity. He has been represented in this court by able counsel who have gone over the record with a fine-tooth comb and have left little unsaid on his behalf. It is inconceivable that on a new hearing anything pertinent or material could be presented that was not presented before. Nothing has been presented to warrant our believing that there exists any likelihood that a new hearing might produce a different result. It is long past the time for closing the book in this matter. For all concerned,

and we think, particularly for the respondent who we can only assume has suffered much mental anguish during the time that has elapsed since the submission of the commissioners' report, that should be done now, belatedly as it may be. The respondent's exceptions are overruled.

We now reach the question of what action should be taken herein. This is by far the most difficult question to decide in the case. Judgments can easily and reasonably differ on what should be done with respondent. While the purpose of disciplinary proceedings is primarily for the protection of the public and the bar and not for punishment of the offending attorney (*In re Bevins*, 26 Haw. 570), the element of punishment and the necessity of determining the extent thereof is inevitably present whenever disciplinary action against an attorney is warranted. *In re Breidt*, 84 N.J. Eq. 222, 94 Atl. 214; *In re Donegan*, 282 N.Y. 285, 26 N.E.2d 260; 7 C.J.S., *Attorney and Client*, § 28, at p. 771. In determining the action to be taken, each case must be decided upon its own particular facts and circumstances. *In re McLendon, Mo.*, 337 S.W.2d 56. General criteria to be considered are as stated in *In re Simmons*, 59 Wn.2d 689, 369 P.2d 947, at p. 956, as follows:

"In making this determination [of disciplinary action], we consider the seriousness and circumstances of the offense and these standards: (1) Punishment of the offender, which should be sufficient to prevent reoccurrence, (2) a penalty sufficient to deter other practitioners from engaging in such conduct, and (3) punishment sufficient to restore and maintain respect for the honor and dignity of the profession, and to assure those who seek the services of attorneys at law that the penalties for unprofessional conduct will be strictly enforced."

As has been pointed out, the respondent has undoubt-

edly labored under the cloud of the charge against him at least since the filing of the commissioners' report in 1958. This ordeal is a proper factor to be considered in reaching our ultimate decision herein. See *In re Petersen, supra,* 208 Cal. 42, 280 Pac. 124; *In re Patterson, supra,* 9 Cir., 176 F.2d 966; *In re Platz, supra,* 60 Nev. 296, 108 P.2d 858. Considering that factor, along with all other circumstances of the case, it is the consensus of the court that in application of the criteria set out in *In re Simmons, supra,* the ends of justice will be served and the purpose of this proceeding attained by suspension of respondent from the practice of law in this State for a period of three months.

Judgment will be entered accordingly.

*Robert W. B. Chang* and *Howard K. Hoddick* (*O. Vincent Esposito* and *Hoddick, Rothwell & Chang* on the briefs) for respondent.

*Shiro Kashiwa,* Attorney General, and *Yoshio Shigezawa,* Deputy Attorney General, contra.